1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA

10   LAVIRRISE BYNES,                              No. 2:21-cv-01537-DJC-AC

11                    Plaintiff,
                v.
12                                                 ORDER
     SOLANO COUNTY SHERIFF'S
13   DETECTIVE OLMSTEAD and DOES 1–
     25,
14
                     Defendants.
15

16          This case centers on Plaintiff's allegations that a detective fabricated a witness's

17   testimony in order to prosecute her for bomb threat calls made to a local community

18   college on March 12, 2018.  (ECF No. 15.)  While the detective's report and testimony

19   at the preliminary hearing was in tension with recorded statements of the witness, his

20   explanation that he presented portions of her testimony that were unrecorded is not

21   contradicted by evidence in the record.  Critically, the import of her testimony – that

22   Plaintiff was at the scene when the bomb threats were made – was established by

23   Plaintiff's own statements.  There is also ample other evidence tying Plaintiff to the

24   underlying crime: the calls were made from a phone in Plaintiff's office, she was

25   attending the community college to which the threats were made and was on

26   academic probation, she had a quiz and important assignment due the day of the

27   bomb threats that would determine whether she passed the class, and she told

28   detectives that she "never meant to hurt anybody."  In light of all the evidence, the

1    Court concludes that no reasonable juror could conclude that the detective

2    deliberately fabricated evidence that caused Plaintiff to be charged with the bomb

3    threat, or that Plaintiff was prosecuted with malice and without probable cause.

4    Accordingly, the Court hereby GRANTS summary judgment in favor of Defendant.

5                              **FACTUAL BACKGROUND**

6          On March 12, 2018, Defendant Charles Olmstead was on duty as a Detective

7    for the Solano County Sheriff's Office.  (Defendant's Statement of Undisputed Facts

8    ("Def.'s SOF") (ECF No. 42-1) ¶ 1.)  That day, Defendant received a report of two bomb

9    threats called into the Solano Community College Fairfield Campus at 12:05 p.m. and

10   12:08 p.m. (*Id.* ¶¶ 2–4.)  In response to these threats, all three Solano Community

11   College campuses were evacuated.  (*Id.* ¶ 5.)

12         Solano Community College notified Defendant that their computer system

13   traced the bomb threat calls to phone number 707-562-5673, which belonged to the

14   Global Center for Success ("Center"), an outreach center assisting homeless and

15   underserved clients.  (*Id.* ¶ 6; First Amended Complaint ("FAC") (ECF No. 15) ¶ 13.)

16   Defendant, along with Solano County Sheriff's Detective Hendrix, reported to the

17   Center around 1:30 p.m. on March 12, 2018, where they spoke with several

18   employees of the Center concerning the bomb threats.  (Def.'s SOF ¶ 7; Notice of

19   Lodging, Ex. 1 ("Olmstead Dep.") (ECF No. 43), at 12:19, 22:13–23.)

20         First, Defendant spoke with the Center's Executive Director, Richard Porter, who

21   informed Defendant that the Center had four phone lines located at different

22   positions within the building.  (Def.'s SOF ¶ 8.)  Porter informed Defendant that phone

23   number 707-562-5673 was assigned to line number 1 in the office.  (*Id.* ¶ 9.)  Porter

24   also informed Defendant that (1) Kenneth Bryant, an Administrative Assistant, (2) Eva

25   Bernardes, the Program Director, (3) Charlotte Webb, a Senior Case Manager, and

26   (4) Plaintiff Lavirrise Bynes, a Case Manager, were all at the Center that day.  (*Id.* ¶ 10.)

27   Porter further informed Defendant that Plaintiff, who was a student at Solano

28   Community College, worked at the Center on Mondays from 9:00 a.m. until around

noon. (*Id.* ¶¶ 11, 32.) Porter showed Defendant there were phones in his office, at the front desk, in Webb's office, in Bernardes's office, and in Plaintiff's office. (*Id.* ¶ 12.) Finally, Porter informed Defendant that Webb and Plaintiff's offices were typically locked as they contained confidential client files. (*Id.*) However, Defendant later learned that keys to those offices were kept in the hallway of the Center and were accessible to other parties. (Olmstead Dep. at 25:11–27:10.)

After speaking with Porter, Defendant spoke with Bryant, who informed Defendant that he had left the Center with Webb earlier that day between 12:05 and 12:15 p.m. for lunch, and returned around 1:00 p.m. (Def.'s SOF ¶ 13.) Bryant stated he did not let any of the Center's clients use the phone that day. (*Id.* ¶ 14.) Defendant picked up Bryant's phone and pressed the redial button, which displayed a phone number that did not belong to Solano Community College. (*Id.*)

Defendant then spoke with Webb, who confirmed that she was working at the Center that day, and that she and Bryant left the Center for lunch between 12:05 and 12:15 p.m., returning around 1:00 p.m. (*Id.* ¶ 15.) Webb informed Defendant that Plaintiff left the Center before noon because she had class. (Goff Decl., Ex. A (ECF 42-2), at 12:10–14:30; Notice of Lodging, Ex. 2 ("Webb Dep.") (ECF No. 43), at 9:9–23.) Defendant picked up the phone in Webb's office and pressed the redial button, which displayed a phone number that did not belong to Solano Community College. (Def.'s SOF ¶ 16.)

Porter provided Defendant with the keys to Plaintiff's office. (*Id.* ¶ 17.) Defendant picked up the phone in Plaintiff's office and pushed the redial button, which displayed the number *67864710101. (*Id.* ¶ 18.) Defendant recognized this number as the number the second bomb threat call was placed to. (*Id.*) Plaintiff's phone showed that four separate calls were placed to Solano Community College between 12:02 p.m. and 12:07 p.m. that day. (*Id.* ¶ 19.)

Defendant then interviewed Bernardes, who informed Defendant she arrived at the Center that day in the late morning, and left the Center for lunch between 11:50

a.m. and 12:00 p.m. (*Id.* ¶ 20.) Bernardes stated that the only people left in the Center when she departed were Webb, Bryant, Plaintiff, another lady named Lauren, and two men working in the computer lab at the other end of the building. (*Id.*; Goff Decl., Ex. A, at 24:55–25:06.) Bernardes also informed Defendant that before she left for lunch, she took a photo outside the Center with Webb and Plaintiff. (Goff Decl., Ex. A, at 28:35–29:10.)

Defendant and Detective Hendrix called Plaintiff and asked her to come to the Center so they could speak with her; she agreed. (Def.'s SOF ¶¶ 21, 23.) Plaintiff arrived about ten to fifteen minutes later. (*Id.* ¶ 22.) Defendant interviewed Plaintiff, who stated she had seen one client at the Center that morning, Anthony Gonzalez. (*Id.* ¶¶ 25–27.) Plaintiff also confirmed she took a photo of Webb and Bernardes outside the Center before they left for lunch, and then went back inside the Center to gather her bookbag before leaving herself. (Goff Decl., Ex. A, at 56:50–59:55; Bynes Dep. (ECF No. 41-5) at 50:6–51:8.) After the interview, Defendant went to the Christian Help Center where Plaintiff's client Gonzalez lived. (Def.'s SOF ¶ 28.) Gonzalez confirmed that he was at the Center on March 12, 2018, until about noon, but stated he did not make any calls or use the phones at the Center that day. (*Id.* ¶ 29.)

On March 13, 2018, at around 9:20 a.m., Solano County Sheriff's Deputy Williams contacted Saki Cabrera, an instructor at the Solano Community College. (*Id.* ¶ 30.) Cabrera informed Deputy Williams that she taught introduction to case management at Solano Community College in Fairfield, and that the class met at least once a week for three hours on Mondays from 1:00 p.m. to 4:05 p.m. (*Id.* ¶ 31.) Cabrera confirmed that Plaintiff was one of the students in her class in the Spring 2018 semester. (*Id.* ¶ 32.) Cabrera further stated that Plaintiff had trouble getting into the class because she was on academic probation. (*Id.* ¶ 33.) Cabrera informed Deputy Williams that the students were scheduled to have a quiz on March 12, and that the student's case file forms were also due, which were key to the students understanding

4

1  and passing the class.  (*Id.* ¶ 34.)  Cabrera stated that Plaintiff and one other student

2  were the only students not in class on March 12, 2018.  (*Id.* ¶ 35.)

3          At 10:00 a.m. on March 14, 2018, Defendant and Detective Hendrix returned to

4  the Center to obtain the Center's phone records from Porter, and to speak with

5  Plaintiff.  (*Id.* ¶ 37.)  Defendant and Detective Hendrix then requested Plaintiff return to

6  the Solano County Sheriff's Office to conduct an interview regarding the bomb threat.

7  (*Id.* ¶ 38.)  Plaintiff agreed.  (*Id.*)  Once at the Sheriff's Office, Defendant and Detective

8  Hendrix notified Plaintiff that her interview was voluntary, and that she could terminate

9  it at any time; Plaintiff agreed to speak with the Detectives.  (*Id.* ¶ 39.)  During this

10  interview, Plaintiff admitted that she had failed classes at Solano Community College

11  in the spring and fall semesters of 2017, and that she was placed on academic

12  probation.  (*Id.* ¶ 40.)  Plaintiff admitted that she would be subject to academic

13  dismissal if she did not comply with the terms of academic probation.  (*Id.* ¶ 41.)

14  Plaintiff also admitted that she "may have" made phone calls from her desk on March

15  12, 2018, but stated she did not call Solano Community College.  (*Id.* ¶ 42.)  Plaintiff

16  stated that she did not believe Gonzalez would have any reason to call Solano

17  Community College.  (*Id.* ¶ 43.)  Plaintiff also stated that the keys to her office were

18  missing on March 12, 2018, but then "mysteriously" reappeared during a staff meeting

19  on March 13, 2018.  (*Id.* ¶ 44.)  Finally, Plaintiff again explained that she took a photo

20  of Bernardes and Webb outside the Center before they left for lunch, went back inside

21  the Center to collect her bookbag, and then left the Center for class, but did not see

22  anyone as she left.  (Goff Decl., Ex. B (ECF No. 42-2), at 42:40–45:20, 53:50–56:00.)

23          The Detectives confronted Plaintiff and accused her of making the bomb

24  threats due to stress.  (Def.'s SOF ¶ 45.)  Plaintiff did not deny these allegations at first,

25  but then denied that she was under any form of stress that day.  (*Id.*)  Plaintiff stated:

26          I never meant to hurt anybody, I ain't did nothing to nobody,
           I can't explain how the phone [call] was made by my office.  I
27          don't know what happened.  I didn't do it.  I work hard to get

28

5

to whatever it is I got going and I'm not going to throw it away making no dogon bogus phone calls. I'm not.

(*Id.* ¶ 46; Goff. Decl., Ex. B, at 1:21:05–30.) At the end of the interview, the Detectives arrested Plaintiff. (Def.'s SOF ¶ 47.) Following the investigation, Defendant turned over all documents, information, and audio recordings related to the investigation to the Solano County District Attorney's Office. (*Id.* ¶ 48.)

Deputy District Attorney Elaine Kuo ("DA Kuo") called Defendant to testify at Plaintiff's preliminary hearing based on what he wrote in his incident report. (Plaintiff's Material Disputable Facts and Supporting Evidence ("Pl.'s SOF") (ECF No. 44-1) ¶ 61.[1]) Defendant testified verbatim to the facts stated in his incident report. (*Id.* ¶ 62.) Notably, Defendant testified that Webb stated she believed Plaintiff was still in her office when she left for lunch. (*Id.* ¶ 63.[2]) Defendant also testified that during his investigation of the bomb threats he interviewed two phone operators who told him the caller's voice was male. (*Id.* ¶¶ 67–68.) Plaintiff is a biological female. (*Id.* ¶ 71.)

DA Kuo argued based on Defendant's report and preliminary hearing testimony that Webb informed officers Plaintiff had not gone out to lunch with them when Webb and other employees left the office at around noon on March 12, 2018, and was therefore at the scene when the bomb threats were made. (*Id.* ¶ 76.) The criminal court found there was probable cause to charge Plaintiff with three counts of false report of bomb to agency or business in violation of California Penal Code § 148.1(a). (Goff Decl., Ex. C (ECF No. 42-2), at 55:20–56:2.)

As a result of the bomb threat charges, Plaintiff was criminally prosecuted for approximately two years before the charges against her were dropped. (Def.'s SOF ¶ 52; Pl.'s SOF ¶ 77.)

---

[1] All facts cited from Plaintiff's Material Disputable Facts and Supporting Evidence are undisputed unless otherwise noted.

[2] Defendant objects to this fact on the basis that Plaintiff did not submit the pertinent portion of Defendant's deposition supporting this fact as an exhibit. However, Plaintiff lodged a full copy of Defendant's deposition transcript with the Court. Accordingly, the Court will overrule this objection.

# PROCEDURAL BACKGROUND

Plaintiff brought this action on August 25, 2021, alleging Defendant falsely wrote in his incident report that Webb believed Plaintiff was still in her office at the Center when Webb left for lunch even though Webb told Defendant during her interview that Plaintiff left before noon.  (FAC ¶ 18.)  Plaintiff further alleged Defendant falsely testified at the preliminary hearing that Webb believed Plaintiff was still in her office when she left for lunch, and that based on Defendant's testimony, the Solano County Criminal Court determined there was probable cause to charge Plaintiff.  (*Id.* ¶¶ 20–21.)  Plaintiff alleged she was incarcerated in the Solano County Jail for two years facing prosecution.  (*Id.* ¶ 40.)   Plaintiff brought three causes of action under 42 U.S.C. § 1983 against Defendant for (1) malicious prosecution, (2) failure to disclose exculpatory evidence, and (3) fabrication of evidence.  (*See id.* ¶¶ 24–41.)

Defendant filed the instant Motion for Summary Judgment on November 15, 2023, seeking dismissal of all causes of action against him.  (*See* Mot. Summ. J. ("MSJ") (ECF No. 41).)  Defendant argues (1) he is immune from suit under California Government Code § 821.6; (2) Plaintiff's claim for malicious prosecution fails on the merits; (3) Plaintiff's claim for failure to disclose exculpatory evidence is barred by California Government Code § 822.2 and fails on the merits; (4) Plaintiff's fabrication of evidence claim is barred by California Government Code § 822.2 and fails on the merits; and (5) he is entitled to qualified immunity.

Plaintiff filed her Opposition on November 29, 2023 (Opp'n (ECF No. 42)), Defendant filed his Reply on December 8, 2023 (Reply (ECF No. 44)), Plaintiff filed a Sur-Reply with leave of the Court on December 20, 2023 (Sur-Reply (ECF No. 52)), and Defendant filed a Response on December 27, 2023 (Response (ECF No. 53)).

The Court held a hearing on January 4, 2024, with Stanley Goff appearing for Plaintiff and Danielle Lewis appearing for Defendant.  The Court ordered the Parties to file supplemental briefing on whether malice can be inferred for a malicious prosecution claim based on fabrication of evidence alone.  (ECF No. 56.)  The

1  supplemental briefing was filed, and the Court deemed the matter submitted.  (ECF

2  Nos. 56–58.)

3  **EVIDENTIARY DISPUTES**

4  As a threshold matter, Defendant objects to Plaintiff's evidentiary support for

5  her Opposition, namely (1) the Declaration of Roger Clark ("Clark Declaration");

6  (2) Exhibits A through C to the Declaration of Stanley Goff, Plaintiff's counsel ("Goff

7  Declaration"); and (3) the Declaration of Lavirrise Bynes ("Bynes Declaration").  (*See*

8  Objs. Pl.'s Evid. (ECF No. 44-2).)

9  Generally, the admissibility of evidence at summary judgment is governed by

10  different rules and motivations than at trial.  At summary judgment, Federal Rule of

11  Civil Procedure 56 allows objections to evidence when "the material cited . . . cannot

12  be presented in a form that would be admissible in evidence."  Fed. R. Civ. P. 56(c)(2).

13  The text of the rule suggests that the focus at summary judgment is on the substance,

14  not the form.  *See Block v. City of Los Angeles*, 253 F.3d 410, 418–19 (9th Cir. 2001).

15  The party seeking entry of evidence bears the burden of proving that such

16  evidence could be presented in an "admissible" form.  *See Pfingston v. Ronan Eng'g*

17  *Co.*, 284 F.3d 999, 1004 (9th Cir. 2002).  If the opposing party objects, the moving

18  party can direct the court to "authenticating documents, deposition testimony bearing

19  on attribution, hearsay exceptions and exemptions, or other evidentiary principles

20  under which the evidence in question could be deemed admissible . . . ."  *In re Oracle*

21  *Corp. Sec. Litig.*, 627 F.3d 376, 385–86 (9th Cir. 2010).  If evidence falls short of "the

22  formalities of Rule 56," a district court may still exercise its discretion "to be somewhat

23  lenient."  *Sch. Dist. No. 1J, Multnomah Cnty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1261

24  (9th Cir. 1993) (collecting cases).

25  **I.    The Clark Declaration**

26  Defendant first challenges the Clark Declaration on the basis that Plaintiff only

27  lodged the declaration with the Court along with her Notice of Lodging rather than

28  filing the declaration on the docket and filed the declaration late.  (Objs. Pl.'s Evid. at

1 1–2;) *see* E.D. Cal. L.R. 134(a).  However, Plaintiff has now remedied this default by

2 filing the declaration on the docket, and the Court has excused the late filing.  (*See*

3 Clark Decl. (ECF No. 46); Dec. 13, 2023, Minute Order (ECF No. 49).)  Accordingly, this

4 objection is overruled.

5      Defendant also challenges the Clark Declaration to the extent that it contains

6 legal conclusions.  (Objs. Pl.'s Evid. at 2–3.)  Plaintiff replies that the declaration does

7 not contain legal conclusions; rather, as an expert in police procedures and practices,

8 Clark testifies to findings that support the ultimate issue, i.e., whether Defendant's

9 conduct was consistent with those procedures and practices.  (Sur-Reply at 2–3.)

10      The Court has reviewed the Clark Declaration and agrees that it contains many

11 conclusory opinions that are unsupported by fact or are legal in nature.  For example,

12 Clark opines "Ms. Bynes and co-worker witnesses provided completely exculpatory

13 facts that excluded her as a suspect," but "[n]onetheless these facts were changed to

14 justify her arrest, booking and prosecution," thereby concluding that Defendant

15 deliberately fabricated facts in his report to ensure Plaintiff's arrest.  (Clark Decl. at 10.)

16 Clark also opines "Detective Olmstead failed his required duty in violation of *Brady*,"

17 and "Detective Olmstead filed a false reports [sic] in violation of 118.1 P.C. as noted

18 above."  (Clark Decl. at 25.)  While the Court may consider expert opinions with

19 respect to facts, it must ignore them with respect to ultimate issues requiring a legal

20 determination by the Court.  *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d

21 998, 1016 (9th Cir. 2004).  Thus, the Court will disregard Clark's testimony insofar as

22 he analyzes case law, opines that certain behavior failed to meet specific legal

23 standards, and couches conclusions of law as findings of fact.

24      At the same time, qualified experts may testify about police practices and

25 whether the actions of a police officer in a given situation comport with law

26 enforcement standards.  *See, e.g.*, *M.R. v. City of Azusa*, No. CV 13-1510-DMG-VBKx,

27 2014 WL 12839737, at *8 (C.D. Cal. Oct. 1, 2014) (finding expert could provide

28 testimony about police practices standards and whether a reasonable officer would

1   have acted as the defendant officer in the situation at issue).  Thus, the Court will

2   consider Clark's expert opinion testimony as it relates to the investigative procedures

3   and standards for the Solano County Sheriff's Office and his factual findings that are

4   otherwise based on evidence in the record.

5           Finally, the Court notes that Clark quotes extensively from Defendant's

6   deposition testimony, Webb's deposition testimony, Defendant's incident report, and

7   Detective Hendrix's incident report.  While the Court has been provided with the full

8   transcripts of Webb's and Defendant's depositions, it has not been provided with

9   either incident report.  To the extent that Clark quotes portions of any documents that

10   the Court has not received as evidence, the Court will disregard those quotes.  *See*

11   *Freeman v. Kern County*, No. 1:07-CV-00219-TAG, 2008 WL 4003978, at *6 (E.D. Cal.

12   2008) ("[I]f written documents are relied upon they must actually be exhibited;

13   affidavits that purport to describe a document's substance or an interpretation of its

14   contents are insufficient." (quoting 10A Charles Alan Wright, Arthur R. Miller & Mary

15   Kay Kane, *Federal Practice & Procedure* § 2722 (3d ed. 1998))).

16           Thus, Defendant's objections to the Clark Declaration are sustained in part and

17   overruled in part.

18   **II.    Exhibits to the Goff Declaration**

19           Defendant also objects to Exhibits A through C of the Goff Declaration, which

20   are (1) an audio recording of Defendant and Detective Hendrix's interviews of Webb,

21   Bernardes, Bryant, and Plaintiff on March 12, 2018 ("Exhibit A"), (2) a video recording

22   of Plaintiff's interrogation by Defendant and Detective Hendrix on March 14, 2018

23   ("Exhibit B"), and (3) the transcript of the preliminary hearing before the Solano

24   County Criminal Court ("Exhibit C").  (Goff Decl. (ECF No. 42-2) at 2.)  Defendant

25   argues these exhibits must be disregarded because "Plaintiff's counsel has not

26   established that he has personal knowledge or can otherwise authenticate the

27   purported exhibits" (Objs. Pl.'s Evid. at 3–5), and Exhibit A contains hearsay statements

28   (Resp. at 5.)

1    The Court overrules Defendant's objections to all three exhibits.  As to Exhibits

2    A and B, for summary judgment purposes, it is the contents of the evidence rather

3    than its form that matters.  *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

4    If the contents of the evidence can be presented in an admissible form at trial, those

5    contents may be considered at summary judgment even if the evidence is hearsay.  *Id.*

6    Defendant's hearsay objections lack merit because the information in the recorded

7    statements would be available at trial through live testimony.  (Sur-Reply at 3–5;) *see*

8    *JL Beverage Co., LLC v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016)

9    ("[A]t summary judgment a district court may consider hearsay evidence submitted in

10   an inadmissible form, so long as the underlying evidence could be provided in an

11   admissible form at trial, such as by live testimony.").

12   Further, Defendant's authentication objections lack merit.  First, Plaintiff could

13   produce the contents of Exhibits A and B through live testimony, obviating the need

14   to authenticate the actual audio and video records.  Further, Rule 56(e) does not

15   require that all documents be authenticated through personal knowledge;

16   authentication can rest on any manner permitted by Federal Rule of Evidence ("FRE")

17   901(b) or 902.  *See SEC v. Phan*, 500 F.3d 895, 913 (9th Cir. 2007).  Thus, even if

18   Plaintiff did attempt to introduce the recordings at trial, authentication would not

19   require an affidavit of personal knowledge as Defendant suggests.  Instead, the

20   evidence could be authenticated by witness testimony or by other means.  *See United*

21   *States v. Kabov*, No. 19-50083, 2023 WL 4585957, at *5 (9th Cir. July 18, 2023) ("For

22   audio recordings, a witness who testifies that he recognizes a voice on a recording, or

23   provision of other extrinsic evidence, may be sufficient for authentication."); *González*

24   *v. Douglas*, No. CV 10-623-TUC-AWT, 2017 WL 11631005, at *4 (D. Ariz. June 16,

25   2017) ("A video is typically authenticated either by the people who are in it, the person

26   who recorded it, or bystanders who were present at the filming.").  Accordingly, the

27   Court will consider Exhibits A and B for the purposes of summary judgment.  *See Est.*

28   *of Sanchez v. County of Stanislaus*, No. 1:18-cv-00977-ADA-BAM, 2023 WL 7612399,

1   at *7 (E.D. Cal. Nov. 14, 2023) (overruling objections to use of videotaped statements

2   at summary judgment on hearsay, authentication, and foundation grounds because

3   the statements made in the video would be available at trial through live testimony,

4   and defendants could not realistically challenge the authenticity of the videos).

5        As for Exhibit C, the transcript's authenticity may be established by any manner

6   permitted under FRE 901(b).  Here, Plaintiff argues the transcripts authenticity may be

7   inferred from the contents of the document.  *See* Fed. R. Evid. 901(b)(4) (authenticity

8   may be satisfied by the "appearance, contents, substance, internal patterns, or other

9   distinctive characteristics, taken in conjunction with circumstances").  The Court has

10  reviewed Exhibit C and finds that its authenticity may be inferred based on its

11  appearance and contents.  For example, the transcript bears the signature and license

12  number of an official court reporter and is stamped with the case number of the

13  criminal proceeding.  Nor has Defendant challenged the authenticity of the transcript.

14  *See Maljack Prods., Inc. v. GoodTimes Home Video Corp.*, 81 F.3d 881, 889 n.12 (9th

15  Cir. 1996) (district court did not err in considering unauthenticated documents

16  submitted with summary judgment motion when the documents were produced on

17  company letterhead, and plaintiff did not contest authenticity).  Thus, Defendant's

18  objection to Exhibit C is overruled.

19       In sum, the Court will consider Exhibits A through C of the Goff Declaration in

20  ruling on the Parties' summary judgment papers.

21  **III.   The Bynes Declaration**

22       Finally, Defendant objects to the Bynes Declaration based on its non-

23  compliance with the local rules, which require that non-attorney signatures bearing

24  the "/s/" and the person's name also include a statement that counsel has a signed

25  original.  E.D. Cal. L.R. 131(f).  Plaintiff has now remedied this default by adding such a

26  statement to the declaration.  (*See* Bynes Decl. (ECF No. 45) at 2.)  Defendant's

27  objection is overruled.

28  *////*

### SUMMARY JUDGMENT STANDARD

Summary judgment may be granted when the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The principal purpose of summary judgment is to dispose of factually unsupported claims or defenses.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Therefore, the "threshold inquiry" is whether there are any factual issues that could reasonably be resolved in favor of either party, or conversely, whether the facts are so one-sided that one party must prevail as a matter of law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).  That said, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.* at 248.

In a summary judgment motion, the moving party must inform the court of the basis for the motion and identify the portion of the record which it believes demonstrates the absence of a genuine issue of material fact.  *Celotex*, 477 U.S. at 323.  If the moving party meets its initial burden, the burden then shifts to the opposing party, which must establish that there is a genuine issue of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 (1986).  To meet their burden, parties must either cite materials in the record supporting their position or show that the materials cited do not establish the absence or presence of a genuine dispute.  Fed. R. Civ. P. 56(c)(1).

For the opposing party to succeed and avoid summary judgment, they "must do more than simply show that there is some metaphysical doubt as to the material facts*." Matsushita*, 475 U.S. at 586.  Rather, the opposing party must produce enough evidence such that the specific facts set forth by the nonmoving party, coupled with undisputed background or facts, are such that a reasonable jury might return a verdict in their favor.  *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  In other words, for the moving party to succeed, the court must conclude that no rational trier of fact could find for the opposing party.  *Matsushita*,

13

1   475 U.S. at 587.  However, so as not to usurp the role of the jury, "[c]redibility

2   determinations, the weighing of the evidence, and the drawing of legitimate

3   inferences from the facts are jury functions," and so the court draws all reasonable

4   inferences and views all evidence in the light most favorable to the opposing party.

5   *Anderson*, 477 U.S. at 255; *Matsushita*, 475 U.S. at 587–88.

6   **DISCUSSION**

7   **I.      Immunity Under Government Code §§ 821.6 and 822.2**

8   　　　Defendant's arguments regarding immunity under Government Code §§ 821.6

9   and 822.2 are easily disposed of.[3]  Simply put, state law cannot provide immunity from

10  suit for federal civil rights violations.  *Wallis v. Spencer*, 202 F.3d 1126, 1144 (9th Cir.

11  2000) (explaining that immunity under section 1983 is governed by federal law).  "It is

12  axiomatic that '[c]onduct by persons acting under color of state law which is wrongful

13  under 42 U.S.C. § 1983 or § 1985(3) cannot be immunized by state law.'"  *I.K. v. Sylvan*

14  *Union Sch. Dist.*, 681 F. Supp. 2d 1179, 1204 (E.D. Cal. 2010) (quoting *Howlett v. Rose*,

15  496 U.S. 356, 376 (1990)).  Accordingly, Government Code §§ 821.6 and 822.2 do not

16  provide immunity from Plaintiff's claims under 42 U.S.C. § 1983, and summary

17  judgment on this basis is DENIED.

18  **II.     Deliberate Fabrication of Evidence**

19  　　　Section 1983 provides a federal remedy for deprivation of "any rights,

20  privileges, or immunities secured by the Constitution and laws" caused by a person

21  acting under color of state law.  42 U.S.C. § 1983.  To state a claim under section 1983,

22  a plaintiff must show "(1) the conduct complained of was committed by a person

23  acting under color of state law; and (2) the conduct deprived the plaintiff of a

24  constitutional right."  *L.W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992).

25  

26  [3] Under section 821.6, a "public employee is not liable for injury caused by his instituting or prosecuting any judicial or administrative proceeding within the scope of his employment, even if he acts maliciously and without probable cause."  Cal. Gov. Code § 821.6.  Further, under section 822.2, a

27  "public employee acting in the scope of his employment is not liable for an injury caused by his misrepresentation, whether or not such misrepresentation be negligent or intentional, unless he is

28  guilty of actual fraud, corruption or actual malice."  Cal. Gov. Code § 822.2.

"[T]here is a clearly established constitutional due process right not to be subjected to criminal charges on the basis of false evidence that was deliberately fabricated by the government." *Devereaux v. Abbey*, 263 F.3d 1070, 1074–75 (9th Cir. 2001) (en banc). "To prevail on a [section] 1983 claim of deliberate fabrication, a plaintiff must prove that (1) the defendant official deliberately fabricated evidence and (2) the deliberate fabrication caused the plaintiff's deprivation of liberty." *Spencer v. Peters*, 857 F.3d 789, 798 (9th Cir. 2017). "Fundamentally, the plaintiff must first point to evidence he contends the government deliberately fabricated." *Bradford v. Scherschligt*, 803 F.3d 382, 386 (9th Cir. 2015). Then, the plaintiff can prove the fabrication was deliberate by direct evidence of fabrication, or circumstantial evidence related to the defendant's motive. *Caldwell v. City & County of San Francisco*, 889 F.3d 1105, 1112 (9th Cir. 2018).

To prove deliberate fabrication based on circumstantial evidence, a plaintiff must, a minimum, point to evidence that either (1) defendants continued their investigation of a plaintiff despite the fact that they knew or should have known that he was innocent; or (2) defendants used investigative techniques so coercive and abusive that they knew or should have known that those techniques would yield false information. *Devereaux*, 263 F.3d at 1076. Courts have reasoned that if an "investigator knows that a person is innocent, yet continues the investigation nevertheless, then the evidence suggests circumstantially that the investigator has an unlawful motivation to frame an innocent person, which supports a claim that the investigator deliberately fabricated evidence." *Spencer*, 857 F.3d at 799. "Similarly, if an investigator knowingly uses coercive and abusive techniques that likely will generate false information, then that circumstantial evidence suggests that the investigator is deliberately fabricating evidence." *Id.* "These methods are not themselves independent causes of action." *Bradford*, 803 F.3d at 386. "Rather, they are methods of proving one element – intent – of a claim that the government deliberately fabricated the evidence at issue." *Id.*

15

In cases involving direct evidence, on the other hand, an investigator's intent to fabricate need not be shown. *See Spencer*, 857 F.3d at 793 ("In cases involving direct evidence, the investigator's knowledge or reason to know of the plaintiff's innocence need not be proved."). Rather, deliberate fabrication may be proved by the inclusion of statements that were "never made" in an officer's report, or "when an interviewer deliberately mischaracterizes witness statements in her investigative report." *Id.* at 793, 798 (citation omitted). All the same, there are limits to what constitutes direct evidence; "not all inaccuracies in an investigative report give rise to a constitutional claim," and mere carelessness is insufficient, as are mistakes of tone. *Id.* at 798.

### A.    The Fabricated Evidence

As to what evidence is purportedly fabricated, Plaintiff alleges that Defendant wrote in his incident report and testified at the preliminary hearing that "Webb believed that Bynes was still in her office when she left for lunch." (Olmstead Dep. at 31:24–32:2, 43:4–6.) This testimony was significant because it helped place Plaintiff at the Center when the bomb threats were made. (Pl.'s SOF ¶ 76.) Plaintiff argues that this statement was fabricated because during her interview on March 12, 2018, Webb told Defendant that Plaintiff left the Center before noon while Webb left the Center for lunch between 12:05 and 12:15 p.m. (Opp'n at 12.) This statement was captured on Detective Hendrix's recording made that day. (Goff Decl., Ex. A, at 12:10–14:30.) Accordingly, because Defendant's report and testimony appear to contradict Webb's statement, Plaintiff contends Defendant's statements were fabricated. (Opp'n at 12.)

The Court is skeptical that Defendant's statements were, in fact, fabricated. During his deposition, Defendant conceded that his report and testimony conflicted with Webb's statements made on the March 12, 2018, recording. (Olmstead Dep. at 45:2–47:24.) At the same time, Defendant also explained that Webb's statement, as recorded in his report, was based on testimony Webb gave later during her interview that clarified Plaintiff and Webb were taking a picture outside the Center around noon, and that Plaintiff went back inside the Center after the photo was taken. (*Id.* at

15:6–16:10, 17:13–16, 44:1–10, 45:18–46:12.)  Plaintiff herself confirmed this information, stating that she took a photo of Webb and Bernardes outside the Center around noon and then went back inside to gather her bookbag before leaving for class.  (Goff Decl., Ex. A, at 56:50–59:55; Goff Decl., Ex. B, at 42:40–46:05, 53:50–56:00; Bynes Dep. at 50:6–51:8.)  Thus, Defendant's testimony that Webb later clarified the timeline is not clearly inconsistent with other evidence in the record.  In other words, it is not clear Defendant's report contained a fabrication, deliberate or not, as Plaintiff's own testimony supported Defendant's description of Webb's later testimony and, significantly, placed her inside the Center around the time the bomb threat calls were made.

That said, Webb's later statements were not captured on the audio recording. (Olmstead Dep. at 44:5–10, 46:9–12.)  Because the only available audio recording of Webb's testimony contradicts Defendant's statements, viewing this evidence in the light most favorable to Plaintiff, the Court finds Plaintiff has sufficiently raised a question of fact as to whether there was a fabrication.

**B.    There Is No Direct Evidence of Deliberate Fabrication**

While there may be a question of fact as to the existence of a fabrication, the Court finds that Webb's testimony, as captured on the audio recording, does not constitute direct evidence of *deliberate* fabrication.  As Defendant explained during his deposition, he wrote that Webb believed Plaintiff was still in her office when she left for lunch because "there were multiple, different times [Webb] gave her story" during the March 12, 2018, interview, and Webb "clarif[ied] later that they were taking a picture, at or just after 12 o'clock, and then [Plaintiff] goes back inside."  (Olmstead Dep. at 15:6–16:10, 17:13–16, 44:1–10, 45:18–46:12.)  "I would have written in my report the final statement that was said, not necessarily all the early talk done before, when she was trying to recall what occurred."  (*Id.* at 18:1–4.)  Defendant explained that Webb's later testimony was not captured on the audio recording because

1  Detective Hendrix, who was recording the audio, stepped out of the room.  (*Id.* at

2  44:5–10.)  The audio recording reflects this fact.  (Goff Decl., Ex. A, at 29:15–33:55.)

3        During her deposition, Webb confirmed that she told Defendant Plaintiff left

4  the Center before she left for lunch.  (Webb Dep. at 9:6–10:12, 13:14–19.)  Yet Webb

5  never directly refuted the veracity of Defendant's incident report.  In other words, she

6  never denied that she may have later added to or adjusted her story to tell Defendant

7  about Plaintiff taking a photo outside the Center at or around noon before Webb left

8  for lunch with Plaintiff going back inside.  While the Court cannot definitively say

9  Webb changed her statement to Defendant given that a complete audio recording of

10  her interview is unavailable, Webb's failure to explicitly disavow her alleged later

11  testimony is significant.

12        By contrast, cases where courts have found direct evidence of deliberate

13  fabrication often involve witnesses directly testifying that they never said statements

14  attributed to them.  For example, in *Spencer*, the court held that the plaintiff was

15  entitled to judgment in his favor on his deliberate fabrication of evidence claim when

16  the defendant, a detective who was investigating plaintiff for sexual abuse, included

17  quotations in her investigative reports attributed to witnesses who "unequivocally

18  testified at trial that they had never made those statements."  857 F.3d at 798.  While

19  the court acknowledged that not all inaccuracies in an investigative report give rise to

20  constitutional claims, the court found that the detective's misquotations were

21  egregious enough that they could not be excused as mere "carelessness" or a

22  "mistake of tone."  *Id.* at 799.  For instance, the detective reported that one witness

23  "had made detailed, explicit statements of abuse" when, in fact, she had told the

24  detective "that no abuse had occurred."  *Id.* at 798–9.  Thus, the court found that

25  plaintiff had introduced direct evidence of deliberate fabrication.  Similarly, in

26  *Costanich v. Department of Social and Health Services*, the court found that a social

27  worker's inclusion of purported witness quotations in her investigative report was

28  direct evidence of deliberate fabrication when the witnesses testified that they never

1   made those statements.  627 F.3d 1101, 1112 (9th Cir. 2009).  In particular, the court

2   found that the social worker's use of quotation marks around the witnesses'

3   statements established that her fabrications were deliberate because quotation marks

4   typically indicate to readers that they are reading the statement of the speaker, not an

5   indirect interpretation by the author, thereby lending authority and credibility to the

6   author's work.  *Id.*

7        Here, on the other hand, Defendant did not attribute any direct quotations to

8   Webb, indicating the testimony in his report was his summarization and interpretation

9   of her statements to him.  In addition, Webb never testified that Defendant

10  misrepresented or misquoted her statements, so there is no clear evidence that what

11  Defendant wrote and said was a misstatement.  Rather, Plaintiff asks the Court to infer

12  that Defendant's summary of Webb's testimony is incorrect because Webb's

13  deposition reaffirmed that she told Defendant Plaintiff left the Center before her.  This

14  potential discrepancy, however, is not direct evidence of fabrication.[4]

15       Plaintiff points to no other evidence in the record suggesting the alleged

16  fabrication was intentional.  For example, in *Caldwell*, the court found there was a

17  triable issue as to whether a defendant police officer deliberately fabricated plaintiff's

18  statements in his investigative report when plaintiff testified that "[t]he only thing

19  correct in [the disputed statement] is my name" and presented evidence suggesting

20  the officer had motive to target him during the investigation.  889 F.3d at 1113–4.

21  Specifically, the officer had stopped plaintiff between six and nine times prior to that

22  investigation, had threatened to kill him or throw him in jail during those stops, and

23

24  ───────────────
    [4] In any event, Webb's deposition testimony does not definitively establish when Plaintiff left the Center.
25  While at one point Webb testified as "12:00 approached, I believe it was lunchtime, [Plaintiff] was
    leaving" (Webb Dep. at 9:11–12), later, in response to a question of whether she recalled "telling the
26  officers that [Plaintiff] had left before you and Kenneth Bryant left for lunch," she responded in the
    affirmative, and noted that she left for lunch "closer to 1:00" (*id*. at 9:20–10:3).  Far from clarifying the
27  sequence of events on March 12, 2018, Webb's testimony leaves open whether Plaintiff left the Center
    before noon that day, or whether she left after noon but before Webb went to lunch sometime before
28  1:00 p.m.  Thus, even Webb's deposition testimony arguably puts Plaintiff at the crime scene when the
    calls were made.

1   plaintiff had filed a complaint against the officer related to those threats. *Id.* Here,

2   there is no indication Defendant bore Plaintiff any ill-will or had another motive to

3   pursue her for the crime besides his determination of probable cause.

4        Finally, it is undisputed that Defendant turned over all recordings associated

5   with the investigation to the Solano County District Attorney's Office at the end of the

6   investigation, indicating that DA Kuo could have reviewed the recording of the

7   interview at the Center on March 12, 2018, and heard Webb's statement that Plaintiff

8   left the Center before noon herself. (Def.'s SOF ¶ 48.) This supports the conclusion

9   that Defendant's omission of Webb's earlier statement from his report did not

10  constitute fabricated evidence. *See Nguyen v. City of Garden Grove*, No. 8:21-cv-

11  01775-JVS-ADSx, 2023 WL 9226944, at *9 (C.D. Cal. Dec. 19, 2023) (granting

12  summary judgment for defendant on deliberate fabrication of evidence claim based

13  on alleged omissions in police officer's report of a witness's interview when recordings

14  of the interview were provided to the district attorney and criminal defense attorney).

15       Accordingly, the Court finds that Plaintiff has failed to provide direct evidence

16  of deliberate fabrication. *See, e.g.*, *Peck v. Hinchey*, 755 F. App'x 723, 723 (9th Cir.

17  2019) (affirming grant of summary judgment on deliberate fabrication claims when

18  plaintiffs "failed to raise a genuine issue of material fact that [defendant] deliberately

19  made a false statement or fabricated evidence, as opposed to making reasonable

20  mistakes in methodology or in interpreting data").

21      **C.**    **There Is No Circumstantial Evidence of Deliberate Fabrication**

22       The Court also finds that Plaintiff has not provided circumstantial evidence of

23  intent to fabricate. Plaintiff argues that Defendant continued investigating her even

24  though he knew or should have known she was innocent because: (1) Webb stated

25  that Plaintiff left the Center before noon; (2) there were other potential suspects, such

26  as a woman named Lauren, who were at the Center at the time of the bomb threats;

27  (3) two witness phone operators stated the bomb threat was made by someone with a

28  male voice; and (4) Defendant was informed during the investigation that there was a

1  key to Plaintiff's office in the hallway of the Center that could have permitted someone

2  other than Plaintiff to access her office phone.  (Opp'n at 13–14.)

3        The Court agrees this was potentially exculpatory evidence.  That said, as

4  discussed in Section III *infra*, there was substantial evidence supporting probable

5  cause for Plaintiff's arrest.  Plaintiff fails to show how this exculpatory evidence

6  indicates Defendant knew or should have known of her innocence despite the

7  evidence supporting probable cause.  While Webb told Defendant that Plaintiff left

8  the Center before noon, Plaintiff herself informed Defendant that she took a photo of

9  Webb and Bernardes outside the Center before they left for lunch and then went back

10  inside the Center to fetch her bookbag before leaving for class.  (Goff Decl., Ex. A, at

11  56:50–59:55; Goff Decl., Ex. B, at 42:40–45:20, 53:50–56:00; Bynes Dep. at 50:6-51:8.)

12  Accordingly, Plaintiff's own testimony placed her inside the Center around noon.

13  Further, while two witnesses stated that the bomb threat caller's voice was male, at the

14  preliminary hearing Plaintiff's counsel referred to a third witness who stated, "when

15  she took over the phone call, it sounded like a woman but someone with a smoky

16  voice." (Goff Decl., Ex. C, at 54:27–55:1.)  Thus, there was conflicting witness

17  testimony about whether the bomb threat caller was a man or woman.  (*See* Olmstead

18  Dep. at 24:2–25:10 (indicating Defendant arrested Plaintiff because of her statement

19  that she never meant to hurt anyone and a witness who stated there was a female,

20  raspy voice).)  Finally, while another potential suspect, Lauren, may have been at the

21  Center at noon, and Plaintiff's office may have been accessible to other parties, this

22  does not show Plaintiff was innocent; rather, this opens the door to other possible

23  perpetrators.  But "the police have no affirmative obligation to investigate a crime in a

24  particular way," and Plaintiff has not established that Defendant's failure to follow

25  other possible leads equates to knowing Plaintiff was innocent.  *Gini v. Las Vegas*

26  *Metro. Police Dep't*, 40 F.3d 1041, 1045 (9th Cir. 1994); *see also Tsao v. Desert Palace,*

27  *Inc.*, 698 F.3d 1128, 1147 (9th Cir. 2012) ("While an officer may not ignore exculpatory

28  evidence that would negate a finding of probable cause, '[o]nce probable cause is

1   established, an officer is under no duty to investigate further or to look for additional

2   evidence which may exculpate the accused.'" (quoting *Broam v. Bogan*, 320 F.3d

3   1023, 1032 (9th Cir. 2003) (alteration in original))).

4         Thus, even viewing the evidence in the light most favorable to Plaintiff, a

5   reasonable jury could not find that Defendant knew or had reason to know of Plaintiff's

6   innocence.  *See Spencer v. Peters*, No. C11-5424-BHS, 2014 WL 2208940, at *4 (W.D.

7   Wash. May 28, 2014) ("[W]hen there exists some evidence of a crime and no direct

8   evidence of innocence, it is extremely difficult to conclude that there was sufficient

9   evidence for a reasonable juror to find that an investigator should have known the

10  plaintiff was innocent.").  At worst, Plaintiff's evidence demonstrates Defendant's

11  investigation may have been "careless or inaccurate," but this is insufficient to meet

12  the *Devereaux* standard.  *See Devereaux*, 263 F.3d at 1076–77 ("Failing to follow

13  guidelines or carry out an investigation in a manner that will ensure an error-free result

14  is one thing; intentionally fabricating false evidence is quite another.").  Plaintiff has

15  thus failed to provide sufficient circumstantial evidence from which a jury could find

16  deliberate fabrication.

17        **D.**    **Plaintiff Has Failed to Prove Causation**

18        Finally, the Court finds that Plaintiff has not proven causation.  The Ninth Circuit

19  has recognized that "fabricated evidence does not give rise to a claim if the plaintiff

20  cannot show the fabrication actually injured her in some way."  *Spencer*, 857 F.3d at

21  798.  To establish causation, Plaintiff must show that (1) the fabrication was the cause-

22  in-fact of her deprivation of liberty, meaning that the deprivation would not have

23  occurred in the absence of the fabrication; and (2) the fabrication was the "proximate

24  cause" or "legal cause" of Plaintiff's injury, meaning that injury is of a type that a

25  reasonable person would see as a likely result of the conduct in question.  *Id.*

26        Here, it is undisputed that "[a]t the Plaintiff's preliminary hearing District

27  Attorney Elaine Kuo argued based on Olmstead's report and preliminary hearing

28  testimony that Ms. Webb informed officers that Plaintiff had not gone out to lunch with

1   them when Ms. Webb and other employees left the office at approximately noon on

2   March 12th of 2018 and was therefore at the scene when the bomb threats were

3   made." (Pl.'s SOF ¶ 76; *see also* Goff Decl., Ex. C, at 54:2–5.) Thus, Webb's testimony

4   helped place Plaintiff at the Center around the time the bomb threat calls were made.

5          That said, Plaintiff's testimony – that she took a photo of Bernardes and Webb

6   outside the Center before they left for lunch and then went back inside the Center to

7   collect her bookbag – also placed her inside the Center around noon. (Goff Decl., Ex.

8   A, at 56:50–59:55; Goff Decl., Ex. B, at 42:40–45:20, 53:50–56:00.) This testimony was

9   further corroborated by Bernardes, who told Defendant and Detective Hendrix that

10  she took a photo with Webb and Plaintiff outside the Center before she left for lunch

11  between 11:50 a.m. and 12:00 p.m. (Def.'s SOF ¶ 20; Goff Decl., Ex. A, at 28:35–

12  29:10.) This undermines Plaintiff's claim that Defendant's alleged fabrication was the

13  but-for cause of Plaintiff's injury because, even had the Solano County Criminal Court

14  been presented with Webb's testimony that Plaintiff left the Center before noon, there

15  was other evidence placing Plaintiff at the crime scene. Further, as discussed in

16  Section III *infra*, there was a wealth of other evidence affirmatively supporting

17  probable cause to prosecute Plaintiff. Thus, while Webb's testimony as recorded by

18  Defendant corroborated DA Kuo's timeline and could have contributed to the

19  deprivation of Plaintiff's liberty, this is not sufficient causation under *Spencer*. *See*

20  *Tobias v. East*, No. 20-55845, 2021 WL 5194098, at *1 (9th Cir. Nov. 9, 2021)

21  (reversing district court decision that causation in a deliberate fabrication claim was

22  satisfied when defendant's testimony "could have been important to the chain of

23  events in several ways" because this did not demonstrate the harm would have

24  occurred in the absence of the testimony).

25         Accordingly, the Court GRANTS summary judgment on Plaintiff's third claim for

26  deliberate fabrication of evidence.

27  ////

28  ////

1  **III.   Malicious Prosecution**

2      A plaintiff may bring a malicious prosecution claim under section 1983 "not

3  only against prosecutors but also against others – including police officers and

4  investigators – who wrongfully caused his prosecution."  *Smith v. Almada*, 640 F.3d

5  931, 938 (9th Cir. 2011).  To do so, a plaintiff must allege the defendant prosecuted

6  him (1) with malice, (2) without probable cause, (3) for the purpose of denying him

7  equal protection or another specific constitutional right, and (4) that criminal

8  proceedings against him have terminated in favor of the accused.  *Lacey v. Maricopa*

9  *County*, 693 F.3d 896, 919 (9th Cir. 2012) (en banc).

10      Malice and lack of probable cause are the crux of a malicious prosecution

11  claim.  The probable cause inquiry is objective and is satisfied "when 'under the

12  totality of circumstances known to the arresting officers, a prudent person would have

13  concluded that there was a fair probability that [the defendant] had committed a

14  crime.'"  *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007) (quoting *United*

15  *States v. Smith*, 790 F.2d 789, 792 (9th Cir. 1986)).   Probable cause is not a high bar.

16  *District of Columbia v. Wesby*, 583 U.S. 48, 57 (2018).

17      Malice, on the other hand, is shown through evidence of the defendant's

18  subjective mental state.  *Est. of Tucker v. Interscope Recs., Inc.*, 515 F.3d 1019, 1031

19  (9th Cir. 2008).  Malice is usually a question of fact for the jury.  *Id.* at 1030.  Even so,

20  summary judgment based on "lack of malice is nonetheless appropriate when there is

21  no evidence from which a reasonable fact finder could conclude that the defendant

22  pursued the underlying action with malice."  *Id.*  To show malice, a plaintiff must prove

23  a defendant prosecuted her "without believing her to be guilty, primarily because of

24  hostility or ill will toward her, or for the purpose of obtaining a private advantage

25  against her."  *Thuillard v. United States*, No. CV-04-0368-FVS, 2008 WL 4449959, at *7

26  (E.D. Wash. Sept. 29, 2008).

27      The Court finds that the prosecution was supported by probable cause, which

28  is "an absolute defense to malicious prosecution."  *Lassiter v. City of Bremerton*, 556

F.3d 1049, 1054–55 (9th Cir. 2009).  Specifically, (1) the phone number which made the bomb threats was traced back to the Center (Def.'s SOF ¶ 6); (2) the redial function on Plaintiff's phone at the Center displayed a call to the recipient of the second bomb threat at the time of threat (*id.* ¶ 18); (3) Plaintiff was on academic probation and would be subject to academic dismissal if she did not comply with the terms of academic probation (*id.* ¶¶ 40–41); (4) Plaintiff had a quiz and assignment due in her class at the time of the bomb threat (*id.* ¶ 34); and (5) Plaintiff admitted during questioning that she "didn't mean to hurt anyone" (*id.* ¶ 46; Goff. Decl., Ex. B, at 1:21:05–30).

These same facts were relied on by DA Kuo during her closing argument at the preliminary hearing.  As DA Kuo argued, "we have, then . . . an investigation which traced a number associated with these bomb threats to a number that was associated with a phone assigned to Ms. Bynes in a place where she worked, where she had worked that day, where she had an office that was locked," and "as the only person enrolled in Solano Community College and, as the testimony established, being placed on academic probation at the college, Ms. Bynes was the only person with motive."  (Goff Decl., Ex. C, at 54:6–19.)

The Solano County Criminal Court also found, based on these facts, that there was probable cause to charge Plaintiff with false report of a bomb under California Penal Code § 148.1(a).  (*Id.* at 55:20-56:2.)  In "California, as in virtually every other jurisdiction, it is a long-standing principle of common law that a decision by a judge or magistrate to hold a defendant to answer after a preliminary hearing constitutes *prima facie* – but not conclusive – evidence of probable cause."  *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (collecting cases).

A plaintiff "can rebut a *prima facie* finding of probable cause [] by showing that the criminal prosecution was induced by fraud, corruption, perjury, fabricated evidence, or other wrongful conduct undertaken in bad faith."  *Id.*  Plaintiff alleges she has made such a showing here because Defendant fabricated evidence by writing in

1  his incident report and testifying at Plaintiff's preliminary hearing that Webb believed

2  Plaintiff was still in her office at the Center when Webb left for lunch on March 12,

3  2018, despite Webb informing Defendant that Plaintiff left the Center before noon.

4  (Opp'n at 8–9.)  But, as discussed in Section II *supra*, Plaintiff has failed to show

5  Defendant deliberately fabricated any evidence.  Accordingly, Plaintiff cannot rebut

6  the presumption of probable cause.  *See Flores v. City of Bakersfield*, No. 1:17-cv-

7  1393-JLT, 2019 WL 7038385, at *26 (E.D. Cal. Dec. 20, 2019) (granting summary

8  judgment in defendant's favor on malicious prosecution claim when plaintiff failed to

9  demonstrate a police officer made deliberately false statements in his probable cause

10  statement or during his preliminary hearing testimony).

11        Plaintiff has also failed to show Defendant's action were motived by malice.

12  Malice may be proved by direct evidence or through inference based on the totality of

13  the circumstances.  *Ayala v. KC Env't Health*, 426 F. Supp. 2d 1070, 1091 (E.D. Cal.

14  2006).  The Ninth Circuit, however, in interpreting California law, has held that

15  probable cause and malice "are not only distinct but that 'a lack of probable cause,

16  standing alone, does not support an inference of malice.'"  *Est. of Tucker*, 515 F.3d at

17  1032 (quoting *Swat-Fame, Inc. v. Goldstein*, 101 Cal. App. 4th 613, 634 (2002),

18  *disapproved on other grounds by Zamos v. Stroud*, 32 Cal. 4th 958 (2004)).  Thus,

19  while a "lack of probable cause can support an inference of malice, [] it is insufficient

20  evidence by itself."  *Hampton-Stein v. Aviation Fin. Grp., LLC*, 472 F. App'x 455, 457

21  (9th Cir. 2012) (citation omitted).

22        Plaintiff does not point to any direct evidence of malice.  Rather, Plaintiff argues

23  the Court may infer malice based on Defendant's alleged fabrication of Webb's

24  statements.  (Opp'n at 10.)  It is true that "falsifying or mischaracterizing evidence does

25  implicitly suggest – or allow the jury to draw an inference of – malice as it requires an

26  affirmative deceitful act by defendant."  *Allen v. Small*, No. CV 16-00396-BRO-GJSx,

27  2017 WL 11635252, at *12 (C.D. Cal. Jan. 26, 2017).  Yet, as held above, the evidence

28  does not show that Defendant fabricated Webb's testimony.  Rather, as Defendant

1  testified, he wrote that Webb believed Plaintiff was still in her office when she left for

2  lunch because Webb adjusted her story later in their interview.  (Olmstead Dep. at

3  15:6–16:10, 44:1–10, 45:18–46:12.)  Even if Defendant omitted Webb's earlier

4  statement from his report, Defendant's testimony does not indicate that he did so with

5  "wrongful motive or evil or sinister purpose." *Ayala*, 426 F. Supp. 2d at 1092 (granting

6  summary judgment for defendants on malicious prosecution claim because "[e]ven

7  construing the evidence and its reasonable inferences most favorably to plaintiffs, a

8  conclusion of malice is not reached").  Plaintiff does not point to any other evidence

9  indicating malicious intent, such as other fabrications. *Cf. Allen*, 2017 WL 11635252,

10  at *12 (holding the malice element of plaintiff's malicious prosecution claim was a

11  question for the jury when defendants had made numerous wrongful

12  mischaracterizations of plaintiff's statements).  Based on all the evidence, the Court

13  cannot reasonably infer any malice on the part of Defendant.

14          Accordingly, the Court GRANTS summary judgment in Defendant's favor on

15  Plaintiff's first cause of action for malicious prosecution.

16  **IV.   Failure to Disclose Exculpatory Evidence**

17          Where "investigating officers, acting with deliberate indifference or reckless

18  disregard for a suspect's right to freedom from unjustified loss of liberty, fail to

19  disclose potentially dispositive exculpatory evidence to the prosecutors, leading to

20  the lengthy detention of an innocent man, they violate the due process guarantees of

21  the Fourteenth Amendment." *Tatum v. Moody*, 768 F.3d 806, 816 (9th Cir. 2014).  This

22  constitutional rule is narrow, as it "is restricted to detentions of (1) unusual length,

23  (2) caused by the investigating officers' failure to disclose highly significant

24  exculpatory evidence to prosecutors, and (3) due to conduct that is culpable in that

25  the officers understood the risks to the plaintiff's rights from withholding the

26  information or were completely indifferent to those risks." *Id.* at 819–20.

27          Defendant moves to dismiss Plaintiff's *Tatum* claim arguing that the decision to

28  arrest Plaintiff was based on the totality of the evidence, and that unlike in *Tatum*,

1    Plaintiff has not shown that evidence from Webb's testimony was "nearly dispositive,

2    not merely material, to the prosecutor's decision" to prosecute.  (MSJ at 17–18.)

3    Further, Plaintiff does not dispute that Defendant turned over all evidence related to

4    the investigation to DA Kuo.  (*Id*.)

5         The Court will grant judgment in Defendant's favor.  A plaintiff must allege that

6    exculpatory evidence was withheld from the prosecutor to state a cognizable *Tatum*

7    claim.  *See Tatum*, 768 F.3d 819–20.  But Plaintiff does not dispute that, "[f]ollowing

8    the investigation, Detective Olmstead provided all documents, information, and audio

9    recordings related to the investigation to the Solano County District Attorney's Office."

10   (Def.'s SOF ¶ 48.)  Thus, because the audio recording of Defendant interviewing the

11   Center's employees on March 12, 2018, was turned over following the investigation,

12   DA Kuo would have been able to listen to Webb's statement that Plaintiff left the

13   Center before noon and compare that statement to the incident report.  Plaintiff fails

14   to otherwise rebut Defendant's arguments concerning her *Tatum* claim in her

15   Opposition.

16        As Plaintiff has failed to put forth evidence supporting her *Tatum* claim, the

17   Court GRANTS summary judgment in Defendant's favor on Plaintiff's second cause of

18   action.[5]

19   **V.   Doe Defendants**

20        The only remaining defendants are Does 1–25 ("Doe Defendants").  Plaintiff

21   named the Doe Defendants in her operative First Amended Complaint, which she

22   filed on April 20, 2022.  (ECF No. 15.)

23        Under Rule 4 of the Federal Rules of Civil Procedure, "[i]f a defendant is not

24   served within 90 days after the complaint is filed, the court – on motion or on its own

25

26   [5] Finally, Defendant argues that he is entitled to qualified immunity on all claims.  (MSJ at 20–22.)  In
     resolving questions of qualified immunity at summary judgment, courts first ask whether the facts, taken

27   in the light most favorable to the party asserting the injury, show the officer's conduct violated a federal
     right.  *Tolan v. Cotton*, 572 U.S. 650, 655–56 (2014).  As held above, the Court finds that Defendant's

28   conduct did not violate any federal right.  Thus, Defendant is entitled to qualified immunity.

1    after notice to the plaintiff – must dismiss the action without prejudice against that

2    defendant or order that service be made within a specified time.  If the plaintiff shows

3    good cause for the failure, the court must extend the time for service for an

4    appropriate period."  Fed. R. Civ. P. 4(m).  This 90-day deadline under Rule 4(m)

5    applies to service on unnamed defendants.  *See Bulgara v. County of Stanislaus*, No.

6    1:18-cv-00804-DAD-SAB, 2020 WL 5366306, at *5 (E.D. Cal. Sept. 8, 2020), *report and*

7    *recommendation adopted*, 2021 WL 1105255 (E.D. Cal. Mar. 23, 2021) (dismissing

8    action against "Doe defendants" for failure to serve within Rule 4(m)'s 90-day

9    deadline).  But "where the identity of the alleged defendant is not known prior to the

10   filing of a complaint, the plaintiff should be given the opportunity through discovery to

11   identify the unknown defendants, unless it is clear that discovery would not uncover

12   the identities, or that the complaint would be dismissed on other grounds."  *Wakefield*

13   *v. Thompson*, 177 F.3d 1160, 1163 (9th Cir. 1999).

14          Here, Plaintiff has had ample opportunity to discover the identities of the Doe

15   Defendants but has failed to do so.  Following the filing of Plaintiff's First Amended

16   Complaint, the Court issued an initial scheduling order dictating that "Plaintiff's

17   Amended Complaint naming 'Doe' Defendants shall be filed by 7/15/2022."  (ECF No.

18   19.)  No amended complaint was filed by that date.  The Court also set an initial

19   discovery deadline, May 19, 2023, which was then extended several times until

20   October 20, 2023.  (ECF Nos. 19, 27, 35, 39.)  However, Plaintiff has not moved to

21   amend her First Amended Complaint or otherwise notified the Court of the identities

22   of the Doe Defendants since the close of discovery.  Well over 90 days have elapsed

23   since the filing of Plaintiff's First Amended Complaint.  Thus, Plaintiff has failed to

24   serve the Doe Defendants in compliance with Rule 4(m) and has shown no good

25   cause for this failure.

26          Courts can dismiss Doe defendants sua sponte.  *Urias v. Quiroz*, 895 F. Supp.

27   262, 264 (S.D. Cal. 1995).  Where a plaintiff has failed to effect service in accordance

28   with Rule 4(m) and has failed to identify Doe defendants before the close of discovery,

1    dismissal of Doe defendants is warranted.  *See Williby v. California*, 276 F. App'x 663,

2    665 (9th Cir. 2008) (holding district court's sua sponte dismissal of Doe defendants

3    was merited where plaintiff had failed to identify defendants within allotted discovery

4    period); *Bulgara*, 2020 WL 5366306, at *5 (recommending dismissal of Doe

5    defendants for failure to effect service under Rule 4(m) where defendants were not

6    identified within the allotted discovery period).

7           Accordingly, the Court will dismiss the Doe Defendants without prejudice.

8                                    **CONCLUSION**

9    In accordance with the above, IT IS HEREBY ORDERED:

10          1.  Defendant's Motion for Summary Judgment (ECF No. 41) is GRANTED;

11          2.  The Final Pretrial Conference set for 10/24/2024 is VACATED;

12          3.  The Jury Trial set for 12/9/2024 is VACATED; and

13          4.  The Clerk of Court is directed to enter judgment for Defendant and close

14               this case.

15

16

17   Dated:  July 1, 2024

18                                    THE HONORABLE DANIEL J. CALABRETTA
                                      UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

27

28

                                         30